May it please the court, my name is Laura Mate and I represent Terry Mowatt. I'm going to try to reserve two minutes today. Sorry about that. Move the mic just a little. A little bit lower. There you go. Is that a little better? Yes. Terry Mowatt wants a trial. He always has. The record and statements from both Terry Mowatt and his lawyer shows that Mr. Mowatt was persistent in his conviction that he wanted a trial. He entered a guilty plea after being advised that if he rolled the dice with trial and lost, he would get an exceptional 45-year sentence, an effective life sentence for Mr. Mowatt. Excuse me, he would get or he might get? I'm not so sure. Looking at the record, the suggestion is that he would get. Mr. Mowatt at sentencing said, you know, I was given no choice, either take the plea or get 45 years. And so he was definitely under the impression that if he went to trial he would be getting the 45 years. Maybe he was under the impression if he went to trial he'd get convicted because he believed he was guilty. That may be, but I think the record reflects here that what was driving the decision in Mr. Mowatt's case and I think is common in a lot of cases for defendants facing very high sentences was not so much his assessment of whether he would succeed at trial, but the risk to him of proceeding with trial and taking the chance that he might get convicted of a lesser included, that he might actually get acquitted. It's a different, defendants have different priorities. And it's perfectly rational for Terry Mowatt to be willing to risk going to trial, with the upside, as I said, being a possible acquittal or conviction on the lesser included, when he believed that the maximum that he likely faced was 393 months, but to decide he wasn't willing to take that risk when he understood that it would or even likely would get a 45-year sentence. Was that unreasonable to, was that unreasonable advice? I mean, was that, what was wrong with that belief? Was that, why are you saying that that was ineffective assistance of counsel? What was ineffective here is not so much whether Mr. Gerke should have advised his client to take the plea. The problem here, as in Wiggins before the Supreme Court on a mitigation case, is that the lawyer failed to conduct the necessary investigation to make, to give competent advice. He hadn't looked into the likelihood that the state could obtain an exceptional sentence in this case. And he didn't understand that the two reasons, the two bases for an exceptional sentence offered by the state, actually weren't bases they could succeed on if he looked at all, if he just looked at the annotations in the statute and saw cases like Serrano, which is cited in our brief, that the vulnerable victim and deliberate cruel aggravators cited by the state in its letter were not a basis for an aggravated sentence. Indeed, the case that the state cited in their letter is completely, which is Ogden, is completely distinguishable from the facts in Jerry Volan's case. And why wouldn't that apply if you have someone pinned in a car, against a car, and you shoot them in the back? Well, a couple of responses to that. First, the record wasn't fully developed as to whether anybody was pinned. The state asserted that there was a pinning action, but there's no evidence about that. Second, looking at that case Serrano, which was decided a year before Mr. Moat's plea, the Washington Court of Appeals found there was no vulnerable victim when the victim was suspended in an orchard ape in a tree, which is a caged, raised platform, and they found that that did not constitute vulnerable victim under Washington law. And indeed, in Ogden, the case cited by the state, there was a very different situation where the victim was a homeless man who had been beaten until he was unconscious, and then he was stabbed. And he was certain what the court said in that case was certainly by the time he was unconscious, that's when he became a vulnerable victim. And we don't have similar circumstances in this case. Not to mention that Mr. Gerke's own theory for why an aggravator might apply had absolutely no basis in fact. He relied on his own interpretation of an autopsy report rather than consulting with an expert to decide that that was an aggravating circumstance. So-called crouching down to avoid the shots. Mr. Gerke's theory was that the autopsy report showed that the victim was falling as he was... That's what I meant. And what Dr. Thornton says is that the autopsy report does not show that at all. So the defendant was supposed to have an alibi witness, and that fell apart right before trial. So what evidence is there in the record that he would have gone to trial without this alibi witness? It's true. The alibi witness did disappear around the same time, and that's when Mr. Mowat became aware of that. I point again to his statement at trial that what was driving this decision from him was his belief, based on his attorney's advice, that his exposure was to 45 years. Based on that, there's a reasonable probability, which is the standard we're looking at, that Mr. Mowat would not have pled guilty had he realized that an exceptional sentence was not a realistic possibility in this case. In addition to that statement at sentencing, also in the record are statements from the lawyer and from Mr. Mowat that what they discussed at that time was Mr. Mowat's son, and don't you want to get out while you're still alive to see your son? If you plead, you will. Otherwise, you're going away for a long time, and you're never, ever going to see your son again. How long was the sentence as a result of the guilty plea? It was 310 months. And Mr. Mowat's persistence in his position that he wanted a trial, I think is reinforced by the fact that even that was the 310 months is what the state offered to do in their plea offer, and even after that, even after he got the sentence that the state said they would seek, he still sought to withdraw his plea. The pattern throughout the record is that Mr. Mowat wanted a trial. He didn't want to do this plea, and it was only when he was told by his lawyer, you will never be alive outside of jail to see your son again unless you plead. The lawyer didn't control whether or not the prosecutor sought the exceptional sentence. That was up to the prosecutor, and the prosecutor could seek that regardless of what his lawyer told him. That's true. The prosecutor could seek it, but the lawyer's job at that critical stage for a defendant in trying to decide whether to waive all of his trial rights, the critical role for the lawyer is to be advising the client on the strength of the prosecutor's threats. I mean, there's a range of threats. They can be from empty to sure thing, and one of the reasons we have lawyers at that critical plea stage is to provide defendants with some advice. And what happened here is that his lawyer completely failed to investigate and conduct minimal investigation, factual and legal, to provide him with the advice he needed. If he were convicted and there was not the exceptional sentence, what would he have faced if he had been convicted and there was no exceptional sentence? If he was convicted of first-degree murder, his sentencing range was 310 to 393 months. All right. So it appears that the sentence he got was at the very low end of what he would have gotten even without the exceptional circumstances, right? That's correct, if he was convicted of first-degree murder. But again, I'll go back to the point that for people making that decision, when you're looking at 310 to 393, that's a seven-year spread. And if you go to trial, you have the chance of acquittal. You have the chance of being convicted of a lesser included. And you might be willing to roll the dice on seven years, but not on 20. But doesn't this go back to what my colleague suggested? The alibi witness that he was so relying on flew the coop? We have both of those things happening at the same time. It seems like one is pretty important to go to trial. I mean, Clement had claimed they had a lot of evidence against him, and then he had this alibi witness, he claimed, and the alibi witness disappears. So what then does he have? He basically has himself saying, I didn't do it. Right. He has a reasonable doubt defense. And someone facing a seven-year spread, they could make that decision. It's very different to be asked to make that decision about whether you want to roll the dice at trial. Let's just assume the strength of the state's case. But you still have a chance. You know, crazy things happen at trial. And when you're talking about a seven-year window to somebody who is 21 versus a 20-year window, that's a very significant difference. He did not have the information he needed to make a decision. And what the record shows is what was driving that, even more than the absence of the alibi witness, was that spread and that misinformation from his lawyer that he was facing a 45-year sentence. Thank you, counsel. And I've used up my rebuttal time. That's all right. We'll give you a minute or two for rebuttal. Good morning, and may it please the Court. My name is Paul Weiser. I'm an assistant attorney general for the state of Washington. I'm here on behalf of Eldon Vail, the respondent appellee in this case. This case is before the Court on habeas corpus review under the Anti-Terrorism and Effective Death Penalty Act, specifically Title 28 U.S. Code Section 2254D. Mr. Mollett's claims were, in fact, adjudicated by the state courts, and it's our position that the state court's decision on those claims is entitled to deference under Section 2254D. Mr. Mollett's burden in this proceeding, as it was below, was to show that the state court decisions were either contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. He didn't meet that burden. He has not met that burden on appeal, and we're asking that this Court affirm the district court's decision and the judgment of dismissal. Now, in deciding whether the state court's decision was reasonable, it is important to remember what it was that defense counsel was faced with, the cards that he was dealt. The case against Mr. Mollett consisted of a positive identification by the victim. That was Mr. John Ward. In the time that he survived after the attack, he positively identified Mr. Mollett. This was someone he knew. He knew Mr. Mollett, and he identified him as having been the shooter. There was an identification of the car that was used in accomplishing the murder. Mr. Mollett had rented this gold Buick Century from Enterprise Rental on a day or two before the shooting, and he had rented it in his own name. And the personnel at Enterprise Rental verified that Mr. Mollett was the rental, was the person who had rented the car. And a person who was at the crime scene, other than Mr. Ward, one of the neighbors saw a black male driving a gold American-made sedan at the time of the shooting in that area of Seattle. And we know that Mr. Mollett was driving that car the night of the attack, March 13th of 2000, when he was visiting his uncle at about 10 p.m. or 11 p.m. Wasn't there also some evidence about a dispute about some money owed or something between the two generals? That's correct, Your Honor, although it's now disputed to some extent whether there was a feud. There was evidence, and I believe the evidence that was given to the police was from the sisters that the two men were dating, the Irish sisters, that there was some type of feud involving a backpack, perhaps some drugs, perhaps some cash in it that Mr. Ward had allegedly stolen from Mr. Mollett, and that that provided a motive for the crime. There was also ballistics evidence. Found at the base of the windshield of the Buick, the rental Buick, was a .45-caliber shell casing that was determined by forensics experts to have been fired by the same gun that fired the other shots, the empty shell casings that were found at the crime scene. So there's evidence tying Mr. Mollett to that car. There's evidence tying that car to the crime. And, of course, there was evidence of premeditation. I don't think anyone disputed that whoever committed this crime did it in a premeditated fashion. Mr. Mollett has never really refuted the prosecution's version of the facts of the crime. He had an opportunity during the post-trial motion, the Criminal Rule 7.8 motion, before Judge Jones to demonstrate that perhaps the state's case was not as strong as the state was representing it was to be, but he did not do so. He did not develop the record at that time. And, in fact, the favorable version of the facts that he gives in his opening brief, specifically brief bet 24 to 25, is from defense counsel's testimony at that Criminal 7.8 motion hearing, where defense counsel was describing what he was planning on doing at trial if it went to trial. How was he going to explain away the evidence that pointed to Mr. Mollett? For example, the shell casing in the car. Well, he said that he was going to have to perhaps go to a grand theory, but he determined that the state did not. But he had determined that defense counsel, through his investigation, discovered that one of the employees at Enterprise Rental was a relative of Mr. Ward's. And he was thinking that it was possible that he could trip up the state with that by springing it on them for the first time at trial. And he also questioned whether there really was any kind of feud between the two men, between Mr. Ward and Mr. Mollett, because they were, in fact, dating sisters for a period of time after the alleged theft had occurred. So the theory that Mr. Mollett is presenting in his brief to minimize the state's case was actually something that was developed by defense counsel, the defense counsel who is alleged to have provided ineffective assistance. But there was no chance of an acquittal. I can't stress that enough. There was no defense that Mr. Mollett had. His alibi defense fell apart completely when Mr. Nelson told defense counsel, I would have to commit perjury in order to place Mr. Mollett at my place of business, at the gym, at 5 p.m. on March 13th. And Mr. Mollett himself knew and acknowledged at that post-trial hearing how important Mr. Nelson's testimony was, because it was only Mr. Nelson and it was only his testimony that could place Mr. Mollett someplace other than the crime scene at 5 p.m. on March 13th. There were no records, no employment records of any kind. He was paid under the table, Mr. Mollett was, by Mr. Nelson allegedly. So the only thing that would have established an alibi, a true alibi for this crime, was Mr. Nelson indicated he could not testify. So under the circumstances, it was eminently reasonable for defense counsel to consider some damage minimization. The fact that the alibi defense fell apart on the 22nd of August, after this conversation that defense counsel had with Mr. Nelson, I think any reasonable defense counsel would start looking for cover, start looking to minimize damages, and he talked to Mr. Mollett. Now Mr. Mollett has his version of how that conversation went, but it's interesting that in the post-trial motion hearing, when it was asked of him point blank, why did you plead guilty, his answer was defense counsel told him that he would be able to withdraw his plea after he got a second opinion from a different attorney. That was the reason he gave, why he pled guilty. Judge Jones found Mr. Mollett to be completely incredible and credited Mr. Gerke's version of how it was that he counseled Mr. Mollett and that the decision ultimately was with Mr. Mollett and he agreed that a guilty plea was the reasonable thing to do. And I would point out that the sentencing benefit Mr. Mollett got was not just the difference between 310 months and 393 months. What the prosecutor agreed to do in this case was to drop one of the charges that he had against Mr. Mollett, a separate charge of drive-by shooting, which is a Class B felony under Washington law. And also the prosecutor agreed not to pursue a charge, an additional charge of unlawful possession of a firearm in the second degree. Now, if Mr. Mollett had gone to trial and had been convicted of all three of those crimes, as is likely, that would have raised his offender score for purposes of Washington sentencing law. The sentencing range would have been up to 421 months just for the murder count because of the elevated offender score. So we're looking at quite a broader range than just the seven years that counsel is describing this as being. And that would have been unobjectionable under the subsequent law of Apprendi and Blakely. That would have been just the high end of the standard range, 421 months. So whether 45 years was something the prosecutor would be able to get, whether 35 years was something the prosecutor would be able to get, that was the kind of information that Mr. Mollett had and the kind of exposure that he was under at the time that he decided to plead guilty. And it was reasonable for defense counsel in 2000 to believe that that was a realistic threat because at that time, even after Apprendi came out, it was understood within Washington and virtually nationwide that Apprendi did not have any application to legislatively imposed sentencing guidelines, such as the system in Washington, and that the statutory maximum for a first-degree murder under Washington law was, in fact, life. It wasn't until 2004 that Blakely applied Apprendi clearly to the Washington sentencing scheme, so it was reasonable at the time of counsel's decision. We believe that the state court decision affirming the denial of Mr. Mollett's post-trial motion is entitled to deference under Section 2254B. And I see that my time is up. If the Court has no questions, we'd ask that the Court affirm the district court's judgment of dismissal. Thank you, counsel. Thank you. Rebuttal. We'll give you one minute for rebuttal. Thank you. I will just quickly make one comment. A correction regarding how the offender calculation would have worked if the state had charged all of the counts they threatened to charge. Under Washington law, there's a presumption that sentences run concurrently, not consecutively, and that to impose consecutive sentences in this case would have required the finding of the same aggravators mentioned for the 45-year exception. And in terms of elevating the offender score, that only happens in Washington if it's not considered the same criminal conduct. And here those offenses all would have been the same criminal conduct. And I will stop before I have used my time. Thank you very much. All right, thank you.  The case just argued is submitted for decision by the Court. The next case on calendar for argument is Laser Raffke v. Dr. Reddy's Laboratory.
judges: Fletcher, Rawlinson, Ezra